UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANA AARON SPARKS,

               Plaintiff,                         Civil Action No. 10-cv-14868

          v.                             District Judge Nancy G. Edmunds
                                                  Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 16]**

       Plaintiff Dana Aaron Sparks brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties filed summary judgment motions (Dkts. 11, 16), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 2, 10).

## I.  RECOMMENDATION

       For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and conforms with the relevant legal standards.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

Plaintiff filed an application for disability on November 29, 2007, alleging that he became unable to work on February 28, 2006. (Tr. 13.)  The Commissioner initially denied Plaintiff's disability application on March 28, 2008. (Tr. 103-07.)  Plaintiff then filed a request for a hearing, and on December 7, 2009, he appeared with counsel before Administrative Law Judge ("ALJ") Curt Marceille, who considered the case *de novo*.  (Tr. 28-97.)  In a February 8, 2010 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 10-24.)  The ALJ's decision became the final decision of the Commissioner on October 5, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3.)  Plaintiff filed this suit on December 8, 2010.

### B. Background

Plaintiff was 36 years old at the time of the administrative hearing in this matter.  (Tr. 33.) He has a high school education, and, at the time of the hearing was taking on-line classes to try to get a Bachelor's Degree.  (Tr. 34-35.)  He worked as an assembler for Ford Motor Company until February 28, 2006. (Tr. 87.)

#### 1. Plaintiff's Testimony

At the December 7, 2009 hearing before the ALJ, Plaintiff testified regarding his ankle fracture.  (Tr. 35.)  He injured his left ankle when he was trying to cut down a tree and the trunk snapped and hit his left ankle joint.  (Tr. 35, 40, 274.)

As a result of his injury, Plaintiff had two surgeries in March 2006 and June 2007.  (Tr. 39.) Plaintiff testified that, despite these surgeries, his ankle has not healed, and his next step will be an ankle fusion.  (Tr. 42.) Besides surgery, Plaintiff has sought alternative treatment for his ankle

2

including chiropractic treatment and medical marijuana.  (Tr. 42-46.)

Plaintiff testified to spending most of his day on the couch.  (Tr. 50.)  However, he admitted being able to take care of his two younger sons – ages two and four – immediately after the first surgery.  (Tr. 51.)  He also attends school on-line, plays the guitar, cuts the grass on a riding lawn mower, feeds his chickens and dogs using a scooter, takes out the trash, and does laundry.  (Tr. 51-56.)

Plaintiff stated that he can only stand for five minutes at a time, and can only sit for a half-hour to an hour at a time.  (Tr. 56.)  He testified he can lift thirty pounds.  (Tr. 57.)  He testified that the pain in his ankle has gotten worse since his two surgeries instead of better.  (Tr. 52-53.)

Plaintiff also has a bad right shoulder which is exacerbated by his use of a cane.  (Tr. 57-58.)  As a consequence, he uses a cane with his opposite arm whenever he has to walk more than a couple of steps.  (Tr. 67.)  He also uses crutches a couple of times every three to four months.  (Tr. 73.)

### 3. Nancy Spark's Testimony

Plaintiff's wife, Nancy Sparks, also testified at the December 7, 2009 hearing.  (Tr. 74-86.)  Ms. Sparks works forty hours a week as a registered nurse at the Veteran's Hospital in Ann Arbor.  (Tr. 77.)  While she is working, Plaintiff, her mother and babysitters take care of her children when they are not in day care or preschool.  (Tr. 78-79.)

She testified that her husband could work forty hours a week if he could "put his foot up."  (Tr. 82.)  She also testified that Plaintiff is able to walk using a cane.  (Tr. 74.)

### 2. Medical Evidence

As indicated above, Plaintiff injured his left ankle when attempting to cut down a tree.  (Tr. 277.)  Plaintiff went to Chelsea Community Hospital's Emergency Room regarding this injury on

3

February 26, 2006. (Tr. 277.)  At that time, x-rays illustrated fractures through the "medial and lateral malleoli" of the ankle.  (Tr. 276.)  Plaintiff's medical evidence regarding this injury comes from numerous sources: Dr. William R. Lee, Dr. James R. Holmes, Dr. Marc Strickler, Dr. Jeffrey A. Szczepanski, Dr. Edward P. Washabaugh III, and Dr. Michael W. Smith.[1]  There is also evidence from two state disability examiners.

        *a.  William R. Lee, M.D.*

William R. Lee, MD is the Orthopedic Surgeon that treated Plaintiff's left ankle.  Plaintiff first saw Dr. Lee on February 28, 2006. (Tr. 274.)  At that time, Dr. Lee recommended the following surgical procedure: "open reduction internal fixation of the unstable bimalleolar ankle fracture." (Tr. 275. )

---

[1] Plaintiff saw Dr. Thomas J. O'Keefe from 2003 through 2005 for right shoulder pain as a result of an injury at work. (Tr. 279, 281-285.)  This injury is not the impairment that is the basis of Plaintiff's application, but is relevant as to Plaintiff's ability to ambulate with the aid of a cane and residual functional analysis.  Dr. O'Keefe performed arthrosporic surgery on the shoulder in February 2005. (Tr. 282.)  On August 18, 2005, Dr. O'Keefe noted:

> At this point, I am uncertain as to the etiology of his persistent complaints.  He is on disability and this is a workman's compensation issue.  This may have some bearing on his recovery.  Rather than doing any interventional treatment at this point or making any recommendations with respect to interventional treatment, I elected to obtain a new MRI arthrogram of the shoulder.  I am hoping that this will be of benefit to him and us with respect to the diagnosis and treatment.  We will see him after the MRI arthrogram is done.

(Tr. 283.)

The MRI was normal, as Dr. O'Keefe expected.  (*Id.*)  However, Plaintiff continued to complain of pain.  (Tr. 285.)  These complaints led Dr. O'Keefe to state: "At the moment, I do not see any avenue for treatment that would be appropriate."  (*Id.*)  Therefore, he referred Plaintiff to another doctor – Dr. Janda – for a second opinion.  (*Id.*)

Dr. Lee performed the above-described surgery on Plaintiff's ankle on March 2, 2006. (Tr. 270.) Plaintiff saw Dr. Lee for a post-operation ("post-op") follow-up on March 7, 2006. (Tr. 273.) At that time, Plaintiff indicated that his pain level was a "3/10."[2] (*Id*.) Dr. Lee noted that Plaintiff was "doing well" 5 days post operation. (*Id*.)

Plaintiff saw Dr. Lee for another post-op follow-up on July 31, 2006. (Tr. 272.) Dr. Lee's medical report regarding this appointment indicated that Plaintiff's pain level was a "1/10." (Tr. 272.) He also noted that Plaintiff walked "with a nonantalgic gait."[3] (*Id*.)

Plaintiff returned to Dr. Lee on January 23, 2007. (Tr. 387.) He reported having a pain level of "2/10" at this appointment. (*Id*.) At that time, Plaintiff was also seeing Dr. Marc Strickler and Dr. James R. Holmes. (*Id*.) Dr. Lee suggested Plaintiff return after getting the results of an MRI ordered by one of these other doctors. (*Id*.) Dr. Lee restricted Plaintiff to "sit down work only" at this time. (*Id*.)

Plaintiff returned to Dr. Lee on March 6, 2007 regarding his ankle pain. (Tr. 386.) He rated the pain at "2/10." (*Id*.) Dr. Lee wrote: "At his point, I have offered hardware removal. At the time of hardware removal, I would recommend a left ankle arthroscopy. We would remove any loose bodies that may be causing irritation of the inner lining of [his] joint. He will think about possibly pursuing surgery." (*Id*.)

---

[2] This indicates a pain level of 3 on a scale of 1 through 10 with 10 being the highest level of pain. (Tr. 273.)

[3] Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 98 (Saunders Elsevier eds. 31st 3d. 2007).

### b.  James R. Holmes, M.D.

Plaintiff saw Dr. Holmes for continuing left ankle pain on July 30, 2006.  (Tr. 294.) Dr. Holmes noted, "[h]e seems to have pain out of proportion of his physical examination."  (*Id*.)  Dr. Holmes ordered a CT scan.  (*Id*.)

Plaintiff saw Dr. Holmes again on September 22, 2006.  (Tr. 293.)  At that time, Dr. Holmes indicated Plaintiff's CT scan showed no defect in the ankle besides the hardware from the first surgery.  (*Id*.)  Dr. Holmes wrote: "In the presence of this CT scan, I don't have anything further to offer him at present. . . . I have taken the liberty of referring him to Physical Medicine and Rehabilitation for their ongoing care of what I believe will be non-operative ankle pain that will slowly improve."  (*Id*.)

### c.  Dr. Marc Strickler

Plaintiff saw Dr. Marc Strickler at Associates in Physical Medicine and Rehabilitation, P.C. on October 26, 2006.  (Tr. 394.)  At that point, Dr. Strickler wrote that Plaintiff would "need a job that is primarily sitting, with just occasional standing options."  (Tr. 395.)  Dr. Strickler also wrote, "[a]mputation is probably not warranted at this point, although he may have an adequate distal extremity for which to place prosthesis and allow increased activity and functional use.  The loss of sensation in the distal extremity may not warrant that."  (*Id*.)

Plaintiff saw Dr. Strickler again on January 4, 2007.  (Tr. 389.)  Dr. Strickler recommended medication for pain, an ankle orthosis, and a temporary handicap parking permit.  (Tr. 389-90.)

### d.  Jeffrey A. Szczepanski, DPM

Plaintiff saw Dr. Jeffrey A. Szczepanski, DPM on May 24, 2007 for an initial evaluation of his ankle due to continuing pain.  (Tr. 328.)  In that initial interview, Plaintiff told Dr. Szczepanski

that he was scheduled to have surgery with another doctor, but cancelled it because he and the doctor "just did not see eye to eye regarding his condition." (*Id.*) Dr. Szczepanski agreed to perform the surgery. (*Id.*) Dr. Szczepanski performed the second surgery on Plaintiff's ankle on June 15, 2007. (Tr. 324.) On June 20, 2007, Plaintiff had his first post-op appointment with Dr. Szczepanski. (Tr. 326.) At that point, Plaintiff had mild stiffness. (*Id.*) On June 27, 2007, Plaintiff's staples were removed. (Tr. 325.) In a July 5, 2007 post-op evaluation, Dr. Szczepanski noted that Plaintiff had good range of motion with mild stiffness. (Tr. 324.)

### e. Dr. Edward P. Washabaugh III, M.D.

Plaintiff also saw Dr. Edward P. Washabaugh III, M.D. of Michigan Pain Specialists pursuant to a referral from his family physician – Dr. Smith – on March 3, 2009. (Tr. 397-98.) At that appointment, Plaintiff stated that "[c]onstant manipulation" and "smoking marijuana" helps with his pain. (Tr. 397.) Dr. Washabaugh recommended a bone scan of Plaintiff's ankle and lower back. (Tr. 398.)

Plaintiff had a bone scan on March 9, 2009 performed by Dr. John E. Freitas at S. Joseph Hospital. (Tr. 314-15.) The scan showed findings "most consistent with a non-union or malunion or, less likely, avascular necrosis." (Tr. 314.) Around the same time, Plaintiff had an MRI of his spine. (Tr. 316-19.) This MRI showed mild-moderate lumbar spondylosis, some stenosis, some disc bulging, and mild degenerative changes. (Tr. 317-18.)

Plaintiff saw Dr. Washabaugh again on March 24, 2009. (Tr. 411.) At this time, Dr. Washabaugh suggested the following:

> We discussed that medial branch block testing could be performed to see if this is the source of his low back pain and right hip pain with the possibility of radio-frequency ablation in the future. We also discussed recommendations from the committee which were to

7

> detoxify off of the marijuana with Dr. Malinoff and reassess for
> possible spinal cord stimulator and also counseling  . . . was
> recommended.  The patient was also interested in other alternatives.
> I was able to provide him with the name of a chiropractor . . . who
> uses alternatives.[4]

### f. Dr. Michael W. Smith M.D.

Dr. Smith is Plaintiff's family physician.  (Tr. 321.)  He did not treat Plaintiff's shoulder injury, back issues, or ankle injuries, but received copies of the various reports from the above-named doctors.  (Tr. 321.)

On March 31, 2008, Plaintiff saw Dr. Smith for depression.  (Tr. 402.)  Dr. Smith wrote, "[h]e does not want to continue to treat with drinking and smoking and agrees to try a medication for it."  (*Id.*)  Dr. Smith gave Plaintiff Lexapro samples to try.  (*Id.*)

Plaintiff returned to Dr. Smith on April 14, 2008.  (*Id.*)  In his medical notes, Dr. Smith wrote that Plaintiff "tolerates the medicine."  (*Id.*)  He also wrote that Plaintiff found the medication "useful" and had a "more positive outlook."  (*Id.*)

Plaintiff returned to Dr. Smith again on May 17, 2004.  (Tr. 403.)  At that time, he complained about "pain in his feet."  (*Id.*)  Dr. Smith noted that it was "consistent with plantar fasciatus."  (*Id.*)  Dr. Smith referred him to another doctor – Dr. Schuler.  (*Id.*)

On December 3, 2009, Dr. Smith wrote Plaintiff's counsel a letter that stated: "Despite 2 surgeries, his injuries resulted in a nonunion of fracture.  Resulting in a chronic pain syndrome that so far has been resistant to treatment."  (*Id.*)  He also stated that "Mr. Sparks is markedly limited in his ability to ambulate without likelihood of improvement in the foreseeable future."  (*Id.*)  Lastly,

---

[4] Plaintiff saw Dr. Alan Boyce, a Chiropractor, from December 2009 through May 2009. (Tr.337-85.)

8

he concluded that "Mr. Sparks would meet the definition of 'loss of function' as set forth by the Social Security code." (*Id.*)

### g. State Disability Examinations

On March 18, 2006, Dr. Mary C. Wood examined Plaintiff on behalf of the State Disability Department. (Tr. 296-300.)  In her conclusion, Dr. Wood noted the effects of Plaintiff's ankle injury and spine issues: "There is diminished range of motion of the left ankle and slightly diminished range of motion of the lumbosacral spine." (Tr. 300.) In her Neurologic and Orthopedic Supplemental Report she noted that Plaintiff could sit, do minimal standing, and bend. (Tr. 301.)

On March 25, 2006, Barbara Begian also examined Plaintiff on behalf of the State Disability Department. (Tr. 305-12.) She completed a Physical Residual Function Capacity Assessment form. (*Id.*)  She described Plaintiff as "partially credible." (Tr. 310.)  She stated that the Plaintiff could perform sedentary work with a maximum of four hours of standing/walking with the use of a cane. (Tr. 312.)  She also limited Plaintiff's overhead reaching and stated he should do no work at unprotected heights or around hazardous machinery. (Tr. 309, 312.)  She also restricted Plaintiff from working at a job that had "uneven terrain." (Tr. 309.)

### 4. Vocational Expert's Testimony

Vocational Expert ("VE") Georgette Gunther testified at the hearing. (Tr. 86.)  The ALJ asked the VE to assume the following hypothetical individual:

> I'd like you to assume an individual who can perform sedentary work as the regulations define that term.  He requires a sit/stand option alternatively at will, okay, providing that the person is not off task more than 10 percent of the day.  Can occasionally stoop, crouch, kneel, occasionally reach overhead with the right hand.

(Tr. 87.)

9

The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work as an assembler, which is classified as unskilled at the heavy exertion level. (Tr. 87.) However, such an individual could perform the following jobs: surveillance system monitor, information clerk, bench assembly, and bench inspector. (Tr. 88.) The VE testified that there are 400, 2,485, 1,735 and 610 of these jobs available in the lower peninsula of Michigan, respectively. (Tr. 87-88.) She also testified that these jobs would allow Plaintiff to elevate his foot. (Tr. 88.) She further testified that "canes do not prevent people from working." (Tr. 93.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment

10

meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of February 28, 2006. (Tr. 15.) At step two, the ALJ found that Plaintiff had the following severe impairment: status post left ankle fracture with non-union of the left lateral talus; and disc herniation at T11-T12 without spinal cord compression or stenosis. (Tr. 15.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "sedentary work as defined in 20 C.F.R. § 404.1567(a). The claimant requires a sit/stand option allowing him to sit or stand alternatively at will every 30 minutes, provided he is not off task more than 10 percent of the time." (Tr. 16.) The ALJ also stated that Plaintiff was "capable of occasional stooping and overhead reaching with the right arm." (*Id*.) He also stated that the Plaintiff should be limited to minimal crouching and

kneeling, and should be able to elevate his foot while seated. (*Id.*) At step four, the ALJ found that Plaintiff could not perform his past relevant work an assembler. (Tr. 22-23.) However, at step five the ALJ stated that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 23.) Therefore, the ALJ held that Plaintiff is not disabled as defined by the Social Security Act. (Tr. 24.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

Plaintiff argues that the ALJ's conclusion that Plaintiff's impairments did not meet or medically equal Listing 1.02(A) is not supported by substantial evidence. (Dkt. 11, Pl.'s Mot. Summ. J. at 9-15.)

Listing 1.02(A) states:

> *1.02 Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the

13

affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App'x 1, 1.02(A).

In turn, Listing 1.00B2b states:

Inability to ambulate effectively means an extreme limitation in the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that *limits the functioning of both upper extremities*.

* * *

[E]xamples of ineffective ambulation include, but are not limited to, *the inability to walk without the use of a walker, two crutches or two canes*, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, 1.00B2b (emphasis added).

Plaintiff has the burden of demonstrating that his impairment meets or equals Listing 1.02(A).  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that [his] impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder.").  Moreover, "[i]n order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing."  *Elam ex rel. Golay v. Comm'r Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Plaintiff presents two main arguments with regard to Listing 1.02(A): (1) The ALJ did not

give appropriate weight to the opinion of one of Plaintiff's treating physicians – his family physician, Dr. Smith; and (2) The ALJ did not appropriately consider Plaintiff's previous shoulder injury in determining his ability to ambulate.  (Dkt. 11, Pl.'s Mot. Summ. J. at 9-15.)

> *1. The ALJ Appropriately Applied the Treating Source Rule to Support his Conclusion that None of Plaintiff's Impairments Met or Medically Equaled Listing 1.02*(A)

With regard to Dr. Smith, Plaintiff argues that the ALJ failed to consider his opinion that Plaintiff "is markedly limited in his ability to ambulate" and "would meet the definition of 'loss of function' as set forth by the Social Security code."  (Tr. 409.)

Under the treating source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p.

A review of the ALJ's decision in conjunction with Plaintiff's medical record reveals that the ALJ considered the opinions of *all* Plaintiff's treating physicians and gave them *all* appropriate weight.  It is not disputed that Dr. Smith was one of Plaintiff's treating physicians.  However, Plaintiff had multiple treating physicians for his multiple impairments.  As detailed above, Dr. O'Keefe treated Plaintiff's shoulder.  (Tr.279, 281-85.)  Plaintiff's ankle injury was treated by Drs. Lee,  Holmes, Strickler, Szczepanski, and  Washabaugh III.  (Tr. 270-94, 313-36, 386-87, 389-90, 397-98, 411.) Dr. Smith was Plaintiff's family physician.  (Tr. 321.)  While he received carbon copies of all the medical notes and reports from Drs. Lee, Holmes, Stricker, Szczepanski and Washabaugh, he did not treat Plaintiff's ankle, shoulder or back.  (Tr. 385-421.)

With regard to Dr. Smith's opinion on Plaintiff's ankle, the ALJ wrote:

> Dr. Smith, the claimant's family physician, opined that the claimant's condition meets the functional loss contemplated under the Regulations. I reject Dr. Smith's opinion as there is no objective support for his opinion in the evidence of record. Additionally, it appears that Dr. Smith does not see the claimant very frequently and there are no treatment notes from Dr. Smith documenting the degree of limitation needed to meet a listing.

(Tr. 16.)

As stated above, an ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence of record or is not supported by clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence or a lack of clinical support, the treating physician's opinion is weighed against the contradictory evidence. *Id.* When the opinions of treating physicians are inconsistent with each other, greater weight is to be given to the opinion of the physician that actually treated the impairment. 20 C.F.R. § 416.1527(d)(2)(ii).

Applying this law to the facts of this case, the ALJ properly considered Dr. Smith's letter of December 3, 2009. The letter was conclusory and not based on any clinical diagnostic techniques such as MRI, CT Scans, x-rays or bone scans. (Tr. 409. ) Indeed, Dr. Smith did not perform, order or review any diagnostic techniques with regard to Plaintiff's ankle. (Tr 402-05, 410, 414, 417.) Again, he did not treat Plaintiff's ankle. (*Id.*) As might be expected from one's family doctor, Dr. Smith's treatment notes address Plaintiff's other impairments such as depression, the flu, heartburn, plantar fasciatus, jock itch, a bee sting, poison ivy, and ear pain. (Tr 402-05, 410, 414, 417.)

In addition, the letter is inconsistent with the other medical evidence in the record. (Tr. 270-94, 313-36, 386-87, 389-90, 397-90, 411.) None of the doctors who actually treated Plaintiff's ankle injury indicated that Plaintiff was "markedly restricted" in his ability to ambulate. (*Id.*) Indeed, one

16

of Plaintiff's treating physicians noted that he walked without limping or counteracting to avoid pain. (Tr. 387.) Therefore, the ALJ was well within the mandates of C.F.R. § 416.927(d)(2)(ii) in rejecting Dr. Smith's opinion with regard to Plaintiff's ankle.

The Plaintiff additionally suggests that if the ALJ found Dr. Smith's opinion inadequately supported, he had a duty to contact Dr. Smith to obtain further medical proofs. (Pl.'s Mo. Summ. J. at 14.) This is a misstatement of the law.

The regulations provide that when the *medical record is inadequate*, the ALJ is obligated to recontact the appropriate medical source to determine whether the additional information is readily available. 20 C.F.R. § 404.1512(e) (emphasis added.) In this case, the ALJ specifically stated that "there is ample evidence in the [medical] record." (Tr. 16.) In making this statement, the ALJ cited the medical records of Dr. Lee, Dr. O'Keefe and state disability examiner Wood. (Tr. 16, 272-74, 279, 281-85, 296-300, 386-87.) The Court notes that it is the inadequacy of the *record* which triggers the obligation to re-contact a physician – not Plaintiff's dissatisfaction with the ALJ's consideration of one treating source's opinion. 20 C.F.R. § 404.1512(e). Therefore, the ALJ had no duty to contact Dr. Smith to obtain further medical proofs.

### 2.   The ALJ Appropriately Considered Plaintiff's Previous Shoulder Injury in Determining His Ability to Ambulate

In order for Plaintiff's ankle injury to meet or equal Listing 1.02(A), Plaintiff must demonstrate an "inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App'x,1, 1.02(A). Plaintiff argues that the ALJ did not consider Plaintiff's shoulder injury in conjunction with his ankle injury in determining whether he had the ability to ambulate effectively. (Dkt. 11, Pl.'s Mot. Summ. J. at 15.) Specifically, Plaintiff argues that the ALJ did not address the fact that Plaintiff testified that his shoulder problems forced him to use his left hand to hold his cane. (*Id.*) Defendant

17

counters that "use of a cane does not equate to an inability to ambulate effectively." (Dkt. 18, Def.'s Mot. Summ. J. at 18.)

This Court agrees with the Defendant. First, the specific language of Listing 1.00B2b defines the inability to ambulate effectively as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand held assistive device(s) that *limits the functioning of both upper extremities*." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, 1.00B2b (emphasis added). Plaintiff uses a cane. (Tr. 57-58.) Therefore, one of Plaintiff's upper extremities – his left arm – is limited by a hand held assistive device. (*Id.*) The other upper extremity – the right arm – is not limited by a hand held assistive device. (*Id.*) Even given Plaintiff's prior shoulder injury, there is little evidence in the record that Plaintiff's right shoulder function is limited to the extent contemplated by Listing 1.00B2b. (Tr. 270, 281-85.) Indeed, Plaintiff admits that the right shoulder is "nearly within normal limits." (Dkt. 15, Pl.'s Mot. Summ. J. at 15.) In addition, Plaintiff admits that the medical evidence regarding his shoulder only reveals that Plaintiff was to continue "with his activity restrictions and precautions at work." (Tr. 284.) There is nothing in Dr. O'Keefe's medical notes to indicate that these "activity restrictions and precautions at work" equate to the type of limited functioning that would satisfy the relevant Listing. (Tr. 279, 281-88.) Indeed, the record reveals that Dr. O'Keefe was perplexed as to Plaintiff's continuing complaints of pain considering the objective medical evidence that illustrated healing "nearly within normal limits." (Tr. 283-85.) Thus, it was appropriate for the ALJ to conclude that Plaintiff's shoulder injury did not impact his ankle injury enough to equate both injuries with Listing 1.02(A). *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

Plaintiff also argues that "SSR 96-6p indicates that, when questions of medical equivalence

18

are at issue, the ALJ is obliged to receive expert opinion evidence from a state agency medical consultant." (Dkt. 11, Pl.'s Mot. Summ. J. at 16.)

In fact, SSR 95-6p states: "An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made." S.S.R. 96-6p, 1996 SSR LEXIS 3 (July 2, 1996). The Policy Interpretation on this ruling, clarifies how this subsection is to be applied. *Id.* It states:

> [A]n administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:
>
> • When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> • When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

(*Id.*)

This ruling is essentially a precaution against ALJs or the Appeals Council being forced into making decisions that should be made by medical experts in situations where either they believe that the evidence may support an equivalency finding, or in situations where additional evidence might change a medical expert's opinion on equivalency. (*Id.*) That is not the case here. It is clear from the ALJ's written decision that he was not of the opinion that the medical evidence suggested any sort of equivalency finding. (Tr. 15-16.) Additionally, the ALJ did not receive any additional evidence that, *in his opinion,* might change the previous opinions of the state agency medical

19

consultants in this case.   S.S.R. 96-6p, 1996 SSR LEXIS 3 (July 2, 1996); (Tr. 18 ("The claimant's attorney submitted treatment notes from Dr. Smith after the hearing.  However, these notes fail to support the claimant's allegations.")).   Therefore, the ALJ appropriately considered Plaintiff's shoulder injury and did not have an obligation to update the medical evidence pursuant to SSR 96-6p.

### G.  Conclusion

For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence and conforms with the relevant legal standards.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

Date:   October 20, 2011                              s/Laurie J. Michelson
                                                      Laurie J. Michelson
                                                      United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on October 20, 2011.

                                    s/Jane Johnson
                                    Deputy Clerk

21